1
2
3
4
5
6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

7

8

9

10

11

12

ARTURO SEPULVEDA AYALA,

Petitioner,

v.

PAMELA BONDI, et al.,

Respondents.

CASE NO. 2:25-cv-01063-JNW-TLF

FINDINGS OF FACT, CONCLUSIONS
OF LAW, AND PRELIMINARY
INJUNCTION ORDER

13

14

## 1. INTRODUCTION

Petitioner Arturo Sepulveda Ayala seeks a preliminary injunction to preserve

the status quo while the Court decides his habeas case. Dkt. No. 14. The facts are

straightforward. United States Immigration and Customs Enforcement (ICE)

arrested Sepulveda Ayala in February 2025 based on a twenty-one-year-old removal

order. Three weeks later, United States Citizenship and Immigration Services

(USCIS) granted him deferred action and work authorization through its U visa

bona fide determination process. ICE has nonetheless continued his detention.

Sepulveda Ayala contends that his deferred action status, *which is still in*

*effect*, bars his removal and makes continued detention unlawful. The Government

15
16
17
18
19
20
21
22
23

1
2

disputes both the Court's jurisdiction and the merits, arguing that deferred action

creates only "lower priority" status and does not preclude removal proceedings.

3
4
5
6

The jurisdictional question turns on whether Sepulveda Ayala's claims arise

from ICE's execution of his removal order—which would trigger 8 U.S.C. § 1252(g)'s

jurisdictional bar—or from the Government's grant and subsequent disregard of his

deferred action status. The Court concludes the latter and finds jurisdiction proper.

7
8
9
10

On the merits, established precedent defines deferred action as the

Government's decision *not* to proceed with removal. Thus, Sepulveda Ayala has

demonstrated a likelihood of success on his claim that this protection makes his

continued detention unlawful. The Court grants the preliminary injunction.

11

## 2.  BACKGROUND

12

### 2.1  Factual background.

13
14
15
16

Sepulveda Ayala is a 53-year-old Mexican citizen who has lived in the United

States for over 20 years. In 2004, the Government issued a removal order against

him, and he was removed from the United States. He reentered without inspection

later that year and has remained in the United States since. Dkt. No. 1 at 4.

17
18
19
20
21

In November 2022, Sepulveda Ayala applied for a U visa with USCIS.

Dkt. No. 2-1 at 12. Based on his pending U visa application, ICE stayed his removal

from the United States until January 23, 2025. *Id.* at 2. In early January 2025,

anticipating that the stay would likely expire before USCIS decided his U visa

application, Sepulveda Ayala requested a renewal of the stay. Dkt. No. 1 at 4 (citing

22
23

Dkt. No. 1-2 at 2, 10). ICE did not adjudicate his request before the existing stay expired.

On February 2, 2025, with no stay in place, ICE reinstated Sepulveda Ayala's 2004 removal order and arrested him. ICE has detained him at the Northwest ICE Processing Center in Tacoma, Washington, ever since. *Id.*; Dkt. No. 1-2 at 2, 4–11.

On February 19, USCIS issued a Bona Fide Determination Notice ("BFD") on Sepulveda Ayala's U visa application, granting him "deferred action" and an Employment Authorization Document ("EAD"), authorizing him to work in the United States. *Id.* at 12–13. The BFD notice states that deferred action is "an act of administrative convenience to the government which gives some cases lower priority for removal." *Id.* at 12. Despite receiving deferred action and work authorization, ICE did not release Sepulveda Ayala and continued to pursue his removal.

On March 6, ICE denied Sepulveda Ayala's pending stay application, explaining, "USCIS has granted your client Deferred Action; it is unnecessary and in fact, redundant, for [Enforcement and Removal Operations] to grant a stay of removal. Accordingly, the ICE [stay of removal request] . . . is herewith denied." Dkt. No. 2-1 at 14–15. This denial acknowledged that deferred action effectively rendered a stay of removal unnecessary. Despite this acknowledgment, however, ICE continued to detain Sepulveda Ayala for removal.

On April 25, ICE conducted a "secondary review" of its March 6 denial and changed its reasoning for denying Sepulveda Ayala's stay:

1

2

> The ICE Office of Enforcement and Removal Operations in Seattle received your ICE Form I-246, Application for Stay of Deportation or Removal. On March 6, 2025, ERO Seattle denied this ICE form I-246 on the basis that you were not subject to imminent removal from the United States. Upon further legal review, this has been determined not to be accurate and a second review and consideration of your ICE Form I-246 was completed.

3

4

5

Dkt. No. 2-1 at 16.

6

That same day, ICE informed Sepulveda Ayala's attorney that it

7

intended to remove him. *Id.* at 2.

8

### 2.2    Procedural history.

9

On March 5, Sepulveda Ayala filed a mandamus action seeking to compel

10

adjudication on his U visa application. *Sepulveda Ayala v. Noem et al.*, Case No.

11

3:25-cv-5185-JNW, Dkt. No. 1. When ICE tried to remove him in April, this Court

12

granted a temporary restraining order in that case. But this Court ultimately

13

denied Sepulveda Ayala's preliminary injunction motion in the mandamus case on

14

grounds not relevant here.

15

On June 6, 2025, Sepulveda Ayala filed this habeas petition, challenging his

16

detention while he has deferred action status. Unlike his mandamus case, which

17

challenged agency processing delays related to his U visa application, this action

18

directly challenges the Government's authority to detain and remove him despite

19

his deferred action status. Dkt. Nos. 1; 2. The Court granted a TRO and set a

20

preliminary injunction motion briefing schedule. Dkt. No. 13.

21

After a hearing on July 8, the Court extended the TRO pending a decision on

22

the preliminary injunction motion. *See* Dkt. No. 17.

23

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

## 3. DISCUSSION

### 3.1    Legal standard.

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). "The proper legal standard for preliminary injunctive relief requires a party to demonstrate [1] 'that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest.'" *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009) (citing *Winter*, 555 U.S. at 20). These four factors—the *Winter* factors—apply whenever a preliminary injunction is sought. *Winter*, 555 U.S. at 20.

The Ninth Circuit takes a "sliding-scale" approach to preliminary relief, under which "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiffs can support issuance of a preliminary injunction, so long as the plaintiffs also show that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Fraihat v. U.S. Immigr. & Customs Enf't*, 16 F.4th 613, 635 (9th Cir. 2021) (cleaned up). This approach allows a stronger showing of one *Winter* factor to offset a weaker showing of another. *Planned Parenthood Great Nw., Hawaii, Alaska, Indiana, Kentucky v. Labrador*, 122 F.4th 825, 843–44 (9th Cir. 2024).

In all circumstances, the moving party must make "a showing on all four prongs" under *Winter* to obtain a preliminary injunction. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

1

2

**3.2    The Court has subject-matter jurisdiction.**

The Government challenges this Court's subject-matter jurisdiction, so the

Court begins there. Federal courts are courts of limited jurisdiction and may not

proceed to the merits without first confirming they have authority to decide the

case. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). When

jurisdiction is challenged, the Court has a continuing obligation to examine the

basis for its authority. *Hernandez v. Campbell*, 204 F.3d 861, 865 (9th Cir. 2000).

In its temporary restraining order, this Court found "at this stage that it has

subject-matter jurisdiction" because Sepulveda Ayala's claims arise from the

Government's grant of deferred action rather than from ICE's decision to execute

his removal order. Dkt. No. 11 at 6-8. The Government now renews its jurisdictional

challenge with additional arguments. For the reasons discussed below, the Court

reaffirms and augments its previous jurisdictional finding.

**3.2.1    Section 1252(g) does not bar jurisdiction because Sepulveda
Ayala's claims arise from the Government's grant of deferred
action, not execution of his removal order.**

The Government argues that 8 U.S.C. § 1252(g) strips this Court of

jurisdiction over Sepulveda Ayala's habeas petition. Section 1252(g) provides that

"no court shall have jurisdiction to hear any cause or claim by or on behalf of any

alien *arising from the decision or action* by the Attorney General *to commence*

proceedings, *adjudicate* cases, or *execute* removal orders against any alien under

this chapter." 8 U.S.C. § 1252(g) (emphasis added). The Government argues this

provision divests this Court of jurisdiction because Sepulveda Ayala's habeas

petition challenges ICE's *execution* of his removal order. But this argument fundamentally mischaracterizes the source of Sepulveda Ayala's claim.

The Supreme Court has interpreted Section 1252(g)'s jurisdiction-stripping provisions narrowly, limiting it to only "three discrete actions": the "'decision or action' to '*commence* proceedings, *adjudicate* cases, or *execute* removal orders.'" *Reno v. Am.-Arab Anti–Discrimination Comm.*, 525 U.S. 471, 482 (1999) ("*AADC*") (quoting 8 U.S.C. § 1252(g)) (emphasis in original). The Court rejected any reading of the statute that would cover "the universe of deportation claims," *id.,* and cautioned against interpreting it to "sweep in any claim that can technically be said to 'arise from'" these three actions, *Jennings v. Rodriguez*, 583 U.S. 281, 294 (2018).

The provision is directed against "a particular evil: attempts to impose judicial constraints upon prosecutorial discretion." *AADC*, 525 U.S. at 485 n.9. And it protects the government from challenges to "'no deferred action' decisions"—that is, when the government chooses *not* to grant deferred action relief. *Id.* at 485. The provision shields discretionary determinations to deny relief, not failures to honor relief already granted, as Sepulveda Ayala claims here. This understanding aligns with the Ninth Circuit's recognition that "[w]here the Attorney General totally lacks the discretion to effectuate a removal order, § 1252(g) is simply not implicated." *Arce v. United States*, 899 F.3d 796, 801 (9th Cir. 2018).

Building on this principle, the proper jurisdictional analysis under Section 1252(g) focuses on the government action or decision that gives rise to the plaintiff's claims, not whether the plaintiff's claims might affect or preclude removal. *Id.* at 799–800. The Ninth Circuit applied this principle in *Arce* when an asylum

petitioner was removed despite a court-ordered stay. *Id*. at 798–99. The Government argued that Section 1252(g) barred the petitioner's subsequent Federal Tort Claims Act lawsuit because it arose from execution of his removal order. *Id*. at 799.

The Ninth Circuit rejected this argument, holding that the petitioner was "not attacking the removal [order] itself" but rather challenging "the violation of [the court's] order." *Id*. at 800. Applying a "but for" causation standard, the court explained: "Put differently, but for the violation of the stay of removal, [plaintiff] would not have an FTCA claim at all." *Id*. The claims arose from the unauthorized violation of the stay, not from the removal execution itself.

Similarly, in *Enriquez-Perdomo v. Newman*, 54 F.4th 855 (2d Cir. 2022), the Second Circuit addressed Section 1252(g) in the context of deferred action. ICE arrested Enriquez-Perdomo for removal in 2017 despite her active Deferred Action for Childhood Arrivals (DACA) status granted years earlier. *Id*. at 858–59. She sued the arresting officers under *Bivens*, and the district court dismissed for lack of jurisdiction under Section 1252(g). *Id*. at 859.

The Second Circuit reversed, holding that Section 1252(g) did not bar jurisdiction. *Id*. at 869. The court focused on the meaning of "execute removal orders" in the statute, concluding that this phrase refers to "*executable* removal orders—that is, existing and enforceable removal orders subject to execution." *Id*. at 863 (emphasis in original). Because Enriquez-Perdomo had received deferred action, her removal order was not "executable" for Section 1252(g) purposes. *Id*. The court emphasized that deferred action is an affirmative immigration benefit and

that "Enriquez-Perdomo's arrest and detention despite that relief [of deferred action] were unauthorized." *Id.* (emphasis added).

Applying these principles reveals that Sepulveda Ayala's claims do not "arise from" ICE's decision to execute his removal order. Rather, his claims arise from the Government's decision to grant him deferred action combined with ICE's subsequent refusal to honor that grant. Here, the Government has already exercised its prosecutorial discretion favorably by granting Sepulveda Ayala deferred action through USCIS's bona fide determination process. ICE's continued detention despite that grant exceeds the bounds of the discretionary authority that Section 1252(g) was designed to protect.

But for the Government's grant of deferred action, Sepulveda Ayala would have no basis to challenge his detention. His twenty-one-year-old removal order, standing alone, would provide lawful authority for detention under 8 U.S.C. § 1231(a). It is because USCIS granted him deferred action—an affirmative immigration benefit—that his continued detention becomes legally questionable. *See Arce*, 899 F.3d at 799–800.

Alternatively, under the Second Circuit's reasoning in *Enriquez-Perdomo*, Sepulveda Ayala's removal order is not "executable" for Section 1252(g) purposes because he has received deferred action. 54 F.4th at 863, 869. No matter how the Government characterizes Sepulveda Ayala's claims, they arise from the Government's decision to grant deferred action and then ignore that grant, not from any discretionary choice about execution of a removal order. Section 1252(g) simply

does not reach claims challenging the government's failure to honor benefits it has already granted.

Because Sepulveda Ayala's claims arise from the Government's grant of deferred action rather than from execution of his removal order, Section 1252(g) does not strip this Court of jurisdiction.

### 3.2.2    A narrow reading of Section 1252(g) avoids "serious constitutional questions."

Courts must interpret statutes to avoid raising serious constitutional questions when a reasonable alternative interpretation exists. *Neal v. Bd. of Trustees of Cal. State Univs.*, 198 F.3d 763, 772 (9th Cir. 1999) (quoting *NLRB v. Cath. Bishop of Chicago*, 440 U.S. 490, 507 (1979) (Federal courts should decline to construe acts of Congress "in a manner that could in turn call upon the Court to resolve difficult and sensitive" constitutional questions.)). The Government's broad interpretation of Section 1252(g) would raise serious constitutional concerns under the Suspension Clause.

The Suspension Clause provides that "[t]he Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." U.S. Const. art. 1, § 9, cl. 2. While Congress may modify the right to seek the writ under certain circumstances, it may not do so without providing "a collateral remedy which is neither inadequate nor ineffective to test the legality of a person's detention." *Swain v. Pressley*, 430 U.S. 372, 381 (1977); *see Aditya W. H. v. Trump*, Case No. 2:25-cv-374, 2025 WL 1420131, at *8 (D. Minn. May 14, 2025) (citing *Swain* with approval).

The parties agree that seeking the writ of habeas corpus is the only way Sepulveda Ayala may challenge the legality of his detention. The Government does not identify any alternative remedy available to him. Dkt. No. 16 at 3. This situation is not unique, as other district courts have recently raised similar concerns about Section 1252(g) and the availability of habeas relief to ICE detainees. *See Ozturk v. Trump*, Case No. 2:25-cv-374, 2025 WL 1145250, at *12–15 (D. Vt. Apr. 18, 2025) (considering whether Congress had provided ICE detainees with sufficient substitute remedy for habeas); *Mohammed H. v. Mayorkas*, 2025 WL 1692739, at *2 (D. Mass. Apr. 21, 2025) (finding Section 1252(g) cannot be read to "entirely preclude any habeas jurisdiction over constitutional challenges to immigration detention").

The Government's expansive reading of Section 1252(g) would eliminate Sepulveda Ayala's only avenue for challenging his detention, raising serious Suspension Clause concerns that courts must avoid when possible. The constitutional avoidance canon therefore supports this Court's narrow interpretation of Section 1252(g) and provides another reason to find that the jurisdictional bar does not apply to Sepulveda Ayala's claims.

### 3.2.3    The Court rejects the Government's remaining jurisdictional arguments.

The Court has carefully considered the Government's arguments on subject-matter jurisdiction and finds them unavailing. First, citing *Velarde-Flores v. Whitaker*, 750 F. App'x 606, 607 (9th Cir. 2019) (unpublished), the Government argues that deferred action status aside, Sepulveda Ayala's petition impermissibly

challenges the execution of a removal order, and so, this Court lacks jurisdiction under Section 1252(g). Dkt. No. 15 at 6. But *Velarde-Flores* does not support the Government's assertion, as it does not analyze deferred action at all. In fact, the Ninth Circuit purposefully avoided the deferred action issue, stating it would "express no opinion" on the subject. 750 F. App'x at 607.

Second, the Government's attempt to distinguish *DHS v. Regents of the Univ. of California*, a case cited in the TRO, misses the mark. True, *Regents* involved rescission of an entire deferred action program rather than individual enforcement decisions. But in rejecting a broad interpretation of Section 1252(g), the Supreme Court held that the jurisdictional bar does not cover challenges to the elimination of deferred action benefits because such challenges do not involve decisions to "commence proceedings," "adjudicate" a case, or "execute" removal orders. 591 U.S. at 19. This principle applies with equal force whether the Government attempts to rescind deferred action wholesale or ignore it individually. And at least one circuit found, as the Court does here, that this holding extends to the BFD EAD process. *See Barrios Garcia v. DHS*, 25 F.4th 430, 449 (6th Cir. 2022) (recognizing that the Supreme Court's discussion of DACA in *Regents* applies to BFD EAD). No matter how the Government frames it, Sepulveda Ayala's challenge is to whether deferred action means anything at all, not to prosecutorial discretion in removal proceedings. In any event, the Court finds that it has jurisdiction for the reasons provided in this order, regardless of *Regents*.

Third, the Government asks this Court to follow *Velasco Gomez v. Scott*, Case No. 25-cv-0522, 2025 WL 1726465 (W.D. Wash. June 20, 2025), a recent

decision in this district. In *Velasco Gomez*, the Honorable James L. Robart
concluded that Section 1252(g) barred jurisdiction over a habeas petition
challenging detention despite deferred action status. Judge Robart's careful
analysis demonstrates the complexity of these jurisdictional questions, particularly
in the evolving context of deferred action determinations. After carefully
considering the law and arguments presented, this Court respectfully reaches a
different conclusion based on its understanding of the applicable precedent and the
particular factual and legal context before it.

While acknowledging the persuasive reasoning in *Velasco Gomez*, several
considerations lead this Court to a different conclusion: (1) the analysis in *Arce* and
other authority establishing that Sepulveda Ayala's claims arise from the
Government's grant of deferred action rather than from execution of his removal
order; (2) the Second Circuit's holding in *Enriquez-Perdomo* that deferred action
renders removal orders non-"executable" for Section 1252(g) purposes; and (3)
constitutional avoidance principles, given that the Government's interpretation
would eliminate any avenue for challenging detention despite active deferred action
status, raising serious Suspension Clause concerns. *See* Sections 3.2.1–2, *supra*.

Having confirmed subject-matter jurisdiction, the Court proceeds to the
merits of the habeas petition.

### 3.3    Sepulveda Ayala demonstrates a strong likelihood of success on his habeas petition.

The first *Winter* factor requires Sepulveda Ayala to show he is likely to
succeed on the merits of his underlying habeas claim.

District courts grant writs of habeas corpus to those who demonstrate their
custody violates the Constitution or laws of the United States.

28 U.S.C. § 2241(c)(3). Habeas corpus "entitles [a] prisoner to a meaningful
opportunity to demonstrate that he is being held pursuant to 'the erroneous
application or interpretation' of relevant law." *Boumediene v. Bush*, 553 U.S. 723,
779 (2008) (quoting, *INS v. St. Cyr*, 533 U.S. 289, 302 (2001)). Courts have statutory
and inherent power to grant such petitions. *Ozturk v. Trump*, Case No. 2:25-cv-374,
2025 WL 1145250, at *15 (D. Vt. Apr. 18, 2025) (citing *Ostrer v. United States*,
584 F.2d 594, 596 n.1 (2d Cir. 1978)). Because habeas proceedings are civil in
nature, the "[p]etitioner 'bears the burden of proving that he is being held contrary
to law, . . . [and] he must satisfy his burden of proof by a preponderance of the
evidence.'" *Aditya W. H.*, 2025 WL 1420131, at *7 (quoting *Freeman v. Pullen*, 658
F. Supp. 3d 53, 58 (D. Conn. 2023) (citations omitted)).

Sepulveda Ayala's detention turns on a pure question of law: the meaning of
"deferred action." The Government detains him under 8 U.S.C. § 1231(a) because it
intends to deport him. But Sepulveda Ayala argues his detention violates federal
law because the Government has deferred his deportation through the grant of
deferred action, eliminating any legal basis for his continued confinement.

Sepulveda Ayala's interpretation of deferred action finds strong support in
established precedent. The Supreme Court described deferred action in *AADC* as
meaning "no action will thereafter be taken to proceed against an apparently
deportable alien, even on grounds normally regarded as aggravated." 525 U.S. at
484 (quoting 6 C. Gordon, S. Mailman, & S. Yale–Loehr, Immigration Law and

Procedure § 72.03 [2][h] (1998)). *AADC* cited Fifth Circuit precedent to support this definition. *Id.* (citing *Johns v. Dep't of Justice*, 653 F.2d 884, 890–92 (5th Cir. 1981)). In *Johns*, the Fifth Circuit distinguished deferred action from a stay of removal, explaining that deferred action means the Government chooses to "refrain from (or, in administrative parlance, to defer in) executing an outstanding order of deportation." 653 F.2d at 890.

The Ninth Circuit has consistently held that deferred action means the Government agency "takes no action 'to proceed against an apparently deportable alien' based on a prescribed set of factors generally related to humanitarian grounds." *Barahona-Gomez v. Reno*, 236 F.3d 1115, 1119 n.3 (9th Cir. 2001) (citation omitted); *Ariz. Dream Act Coal. v. Brewer*, 81 F. Supp. 3d 795, 800 (D. Ariz. 2015) (defining deferred action, generally, as "a form of prosecutorial discretion" by which the Secretary of Homeland Security "decide[s] not to pursue the removal of a person unlawfully in the United States").

Numerous Ninth Circuit opinions confirm that deferred action prevents recipients' removal from the United States. *See Lee v. Holder*, 599 F.3d 973, 974–75 (9th Cir. 2010) (interim relief program providing deferred action to U-visa applicants prevented their removal from the United States); *see also Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957, 958 (9th Cir. 2017) (dissent) (explaining that while deferred action does not grant legal status, it is the Government's "commitment not to deport"); *Alvarez Leal v. Lynch*, 673 F. App'x 630, 632 (9th Cir. 2017) (Pregerson, J., dissenting) ("For decades, the federal government's mechanism for exercising prosecutorial discretion in the context of immigration enforcement

has been deferred action, the formal determination not to remove a particular individual."); *De Sousa v. Dir. of U.S. Citizenship and Immigr. Servs.,* 755 F. Supp. 3d 1266, 1268 (N.D. Cal. 2024) (holding interim benefit of deferred action "protects [noncitizens] against removal from the United States" while U-visa applicants wait for a visa to become available under the statutory cap); *Medina v. U.S. Dep't of Homeland Sec.*, 804 F. Supp. 3d 1224, 1228 (W.D. Wash. 2019) ("Being approved for DACA status is essentially a conditional promise from the Government that it will not seek removal for the applicable term.").

Current USCIS policy aligns with this precedent. The USCIS Policy Manual defines deferred action as "a form of prosecutorial discretion to defer removal action (deportation) against an alien for a certain period of time. Aliens granted deferred action are considered to be in a period of stay authorized under USCIS policy for the period deferred action is in effect." USCIS Policy Manual, Vol. 1, Part H, Ch. 2(A)(4), https://www.uscis.gov/policy-manual/volume-1-part-h-chapter-2 (last visited July 24, 2025).[1] ICE evidently applied this understanding when it denied Sepulveda Ayala's stay application in March, concluding that staying his removal was "unnecessary and redundant" because USCIS had granted him deferred action.

---

[1] The Government argues this section of the manual concerns "Emergencies or Unforeseen Circumstances" and is thus "non-relevant." Dkt. No. 15 at 8–9. But the Government offers no argument or authority explaining why the Court should disregard this comprehensive definition in favor of fragmentary descriptions found elsewhere in the manual. Rather than addressing this gap, the Government directs the Court to USCIS Policy Manual Volume 3, Part C, Chapter 5, asserting that "USCIS has plainly defined deferred action" there. Dkt. No. 15 at 8. The Court has looked. There is no definition of "deferred action" to be found, and what is "plain" is the definition's absence.

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND PRELIMINARY INJUNCTION ORDER - 16

Dkt. No. 2-1 at 14-15. This denial explicitly acknowledged that deferred action operates as a stay of removal, but after litigation began, ICE conducted what it termed a "secondary review" and changed its position entirely. This contradiction undermines the Government's current stance and appears more like a post-hoc rationalization than reasoned agency interpretation. *See Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 213 (1988) ("Deference to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate.").

The Government asks this Court to depart from Ninth Circuit guidance and the USCIS Policy Manual and instead accept the truncated description in Sepulveda Ayala's BFD notice, which states that "deferred action is an act of administrative convenience to the government which gives some cases lower priority for removal." Dkt. No. 2-1 at 12. Setting aside the fact that the Government cites no authority requiring this Court to defer to this description, this description need not conflict with established law: giving cases "lower priority" naturally flows from the Government's decision not to proceed with removal, the core meaning of deferred action.

The Government also cites 8 U.S.C. § 1227(d) in support of its position that it may keep processing removal orders over a grant of deferred action, but this statute undermines rather than supports its argument. Dkt. No. 15 at 8. Section 1227(d) provides that the denial of an administrative stay "shall not preclude the alien from applying for a stay of removal, deferred action, or a continuance or abeyance of removal proceeding under any other provision of the immigration laws[.]"

8 U.S.C. § 1227(d)(2). But if deferred action means only "lower priority" with no effect on the Government's ability to remove a beneficiary, as the Government contends, then ICE would remain free to remove individuals with deferred action whenever it chooses, rendering this statutory alternative merely an illusion.

Next, the Government suggests that deferred action granted through the BFD process differs from deferred action generally speaking. Yet the Government cites no authority establishing a special definition of deferred action for U-visa petitioners. To the contrary, the term "deferred action" has carried consistent meaning "for decades" as the Government's "formal determination not to remove a particular individual." *Alvarez Leal*, 673 F. App'x at 632 (Pregerson, J., dissenting); *see AADC*, 525 U.S. at 484; *cf. Barrios Garcia*, 25 F.4th at 449 (explaining that DACA mirrors BFD process—both establish a process for giving people deferred action benefits).

Lastly, citing *Town of Castle Rock v. Gonzales*, 545 U.S. 748 (2005), the Government argued for the first time at the preliminary injunction hearing that Sepulveda Ayala's deferred action and work authorization are not constitutionally protected property interests because whether to confer or revoke such status is within the Government's discretion. The Fifth Amendment provides that the Government shall not deprive a person of "life, liberty, or property, without due process of law." U.S. Const. amend. V. *Castle Rock* established that "a benefit is not a protected entitlement if government officials may grant or deny it in their discretion." 545 U.S. at 756. Yet once in possession of a particular benefit, it may not to be taken away without procedural due process. *Bell v. Burson*, 402 U.S. 535,

539 (1971); *see Medina v. U.S. Dep't of Homeland Sec.*, No. C17-0218RSM, 2017 WL 5176720, at *9 (W.D. Wash. Nov. 8, 2017) ("[T]he Court also finds that the representations made to applicants for DACA cannot and do not suggest that no process is due to them, particularly in Plaintiff's case where benefits have already been conferred.").

*Castle Rock* does not control here for several reasons. That case involved only an "indirect" benefit from police enforcement of a restraining order, 545 U.S. at 767–68, while deferred action is a direct benefit personally conferred on Sepulveda Ayala with concrete entitlements including lawful presence and work authorization. Even more to the point, *Castle Rock* involved a prospective claim to future services, while this case involves benefits already granted. As one court observed, "even absent a claim of entitlement to an important benefit, once it is *conferred*, recipients have a protected property interest that requires a fair process before the government may take that benefit away." *Inland Empire—Immigrant Youth Collective v. Nielsen*, Case No. EDCV 17-2048, 2018 WL 4998230, at *19 (C.D. Cal. 2018) (internal quotation marks omitted) (emphasis in original) (collecting cases). The Government's position that it can grant deferred action while simultaneously ignoring it entirely in order to detain people would also create the kind of "arbitrary imprisonment without law or the appearance of law" that violates due process. *Boumediene*, 553 U.S. at 785. Thus, *Castle Rock's* reasoning simply does not apply when the Government seeks to revoke without explanation or process a concrete entitlement it has already bestowed.

For the reasons above, the Court finds that Sepulveda Ayala's interpretation of deferred action—that the Government will refrain from executing his removal—finds strong support in Supreme Court precedent, circuit authority, and USCIS policy. In sum, Sepulveda Ayala has shown a likelihood of success on his habeas petition that his detention is unlawful.

**3.4    Sepulveda Ayala faces imminent and irreparable harm.**

The Court has already concluded that Sepulveda Ayala would face irreparable and imminent harm absent preliminary injunctive relief. Dkt. No. 11 at 11. The Court found that this *Winter* factor tips sharply in Sepulveda Ayala's favor and makes that finding again for the same reasons. *Id.* Sepulveda Ayala is 53 years old and has lived in the United States for most of his life. He has resided here continuously for over 20 years, and his wife, children, and grandchildren all live here. He faces deportation, family separation, and additional hurdles in the U-visa process if removed. He will also be unable to use the benefits the Government has affirmatively granted him, including his authorization to work legally in the United States, if ICE removes him. At the hearing, the Government asserted that the only reason it had not removed Sepulveda Ayala was to comply with this Court's TRO. And Sepulveda Ayala's attorney submitted a declaration providing more evidence that Sepulveda Ayala's removal is imminent absent preliminary injunctive relief.

**3.5    The equities and public interest favor a preliminary injunction.**

The final two *Winter* factors, which involve balancing the equities and considering the public interest, merge when the Government is a party to a case. *Padilla v. Immigr. & Customs Enf't*, 953 F.3d 1134, 1141 (9th Cir. 2020). These factors also tip sharply in Sepulveda Ayala's favor. A preliminary injunction would impose little to no prejudice on the Government, which has already issued deferred action and BFD EAD benefits to Sepulveda Ayala. Dkt. 11 at 11–12. Indeed, ICE acknowledged on March 6, 2025, *after it detained him*, that his removal would be inappropriate given his deferred action status. Ultimately, the Court continues to find that preliminary injunctive relief precluding Sepulveda Ayala's deportation would change little to nothing for the agencies involved. On the other hand, Sepulveda Ayala would face life-changing and irreparable harm absent a preliminary injunction. The public interest also favors ensuring that the Government does not detain or deport individuals without a legal basis.

## 4.    CONCLUSION

Accordingly, the Court ORDERS that Defendants and all their officers, agents, servants, employees, attorneys, and persons acting on their behalf in concert or in participation with them are immediately enjoined from:

(a) Removing or deporting Sepulveda Ayala from the United States; and

(b) Transferring Sepulveda Ayala from the Northwest ICE Processing Center to any other facility during the pendency of these proceedings.

No security bond is required under Federal Rule of Civil Procedure 65(c) because Defendants face no realistic likelihood of harm from enjoining their conduct. *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003).

Respondents are ORDERED to respond to Sepulveda Ayala's petition, Dkt. No. 1, by July 28, 2025. If Sepulveda Ayala elects to file a reply, it is due on July 30, 2025. The Clerk of the Court is DIRECTED to NOTE the Petition for July 30, 2025. Dkt. No. 1.

Dated this 24th day of July, 2025 at 4:37 p.m. (PT).

Jamal N. Whitehead
United States District Judge